## In the
## United States Court of Appeals
### For the Seventh Circuit

No. 10-3262

TERENCE TRIBBLE,

*Plaintiff-Appellant,*

*v.*

NICHOLAS J. EVANGELIDES and
ROGER FIESER,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 2533—**William J. Hibbler**, *Judge.*

ARGUED OCTOBER 21, 2011—DECIDED JANUARY 26, 2012

Before BAUER and TINDER, *Circuit Judges,* and MAGNUS-STINSON, *District Judge.**

TINDER, *Circuit Judge.* On Mother's Day, 2006, Chicago Police Officers Nicholas Evangelides and Roger Fieser

_____

* The Honorable Jane E. Magnus-Stinson, District Judge for the United States District Court for the Southern District of Indiana, sitting by designation.

arrested Terence Tribble for drinking on a public way. According to the officers, a search incident to this arrest turned up a heroin packet and a baggie of crack cocaine, so drug possession charges were added. Tribble was jailed for twelve days before bonding out. The drinking charge was eventually nonsuited (that is, dismissed by the prosecution) and, at a brief preliminary hearing, a Cook County judge concluded there was no probable cause for the drug charges. The case was dismissed. The Cook County judge reached his conclusion despite the prosecutions' proffered physical evidence of .1 grams of cocaine and .2 grams of heroin.

Tribble subsequently filed this 42 U.S.C. § 1983 suit against Officers Evangelides and Fieser alleging an illegal stop, false arrest, illegal search, and a violation of due process. Tribble's claims centered on whether the officers had probable cause to arrest him and what they found after they did. The parties, consequently, focused considerable attention on the preliminary hearing. For obvious reasons, if the district judge would allow it, Tribble planned to introduce evidence that the state court judge concluded at the preliminary hearing that there was no probable cause. The defense, in response, rather than objecting to the relevance of or prejudice from such evidence, wanted to explain why that conclusion didn't mean that the officers didn't actually find drugs on Tribble. One way they planned to do this was by calling Richard Sleesman—a law student at the time of Tribble's prosecution who, under the supervision of an Assistant State's Attorney, questioned Officer Evangelides at the preliminary hearing—to testify

that "these charges are traditionally thrown out." In a pretrial ruling (unfortunately, not on the record, but not disputed) the district court rejected Sleesman's proposed testimony and, more generally, barred any testimony about *why* the Cook County judge reached the conclusion he did.

A week before trial, defendants informed the district court that Sleesman was unavailable to testify and moved to replace him on the witness list with Assistant State's Attorney Sabra Ebersole. Ebersole was a prosecutor assigned to handle preliminary hearings in Branch 50, the Illinois circuit court where Tribble's preliminary hearing was held. She's on the record as having said "Ready on Tribble" when his case was called. The district court allowed the substitution. Tribble argues that this was an abuse of discretion. *See Grove Fresh v. New England Apple Prod.*, 969 F.2d 552, 559 (7th Cir. 1992). The substitution of Ebersole for Sleesman, however, was not surprising or prejudicial: Both were present at the preliminary hearing, their predicted testimony was the same, and neither had been deposed. *Id.* The district court did not abuse its discretion by allowing the swap.

At trial, the jury heard two versions of the underlying events. Tribble's version was provided by Tribble himself, Natasha Greer, an ex-girlfriend who had two children with Tribble, and Tribble's adult children. According to this version, Tribble was invited to and attended a large Mother's Day party with lots of food but no alcohol (although one guy did bring vodka; he always did, apparently). At some point, Tribble walked

out of the party with an ice tea and lemon in a plastic cup. Tribble was standing on the sidewalk when Officers Fieser and Evangelides drove past in their squad car. The officers made a U-turn and stopped near Tribble. Officer Evangelides approached Tribble, slapped the drink from his hand, put him against the car, and searched him. Tribble was then cuffed, put in the car, and taken to a nearby police station. Tribble thought he'd be released within a few hours; he thought the charge was nothing more serious than drinking on a public way. When he wasn't released he asked for an explanation. To his surprise, he was charged not just with public drinking, but also with possession of controlled substances.

Officers Evangelides and Fieser told a different story. They testified that they drove past a man holding a clear plastic cup containing a couple inches of brown liquid. They turned around, stopped the car, and Evangelides approached Tribble. Evangelides asked Tribble what he was drinking and Tribble said "a little Remy," as in Remy Martin Cognac. They arrested Tribble for drinking on the public way and searched him. Evangelides claims to have found a heroin packet in Tribble's pocket and a small baggie of crack in his mouth.

Assistant State's Attorney Ebersole (the substituted witness) testified last and complicated this contest of conflicting stories with assertions about the significance—or lack thereof—of the no probable cause finding in state court. After establishing that she attended

Tribble's preliminary hearing, said "Ready on Tribble," and explained that meant she had a good faith belief that the state could carry its burden on Tribble's drug charges, she went on to testify that at Branch 50 preliminary hearings "approximately 25 percent of the cases were findings of no probable cause." Defense counsel then asked: "And would you agree that many of those cases were controlled substance cases involving low gram weight." This elicited a slew of objections, including that the question was leading, called for speculation, and that Ebersole was not qualified to make a statistical judgment. The judge said he would allow the question with the proper foundation. A quick voir dire followed, and the jury learned that Ebersole had been assigned to Branch 50 for about six months and during that period had seen hundreds of preliminary hearings. That was enough for the court, and the officers' counsel was allowed to proceed:

> **Q:** Can you tell me what percentage of cases—well, you've indicated approximately 25 percent there was a finding of no probable cause on any given day?"
>
> **A:** That would be my best recollection.
>
> **Q:** Can you tell me what percentage of that had cases where the controlled substance was a low gram weight?
>
> [Renewed objections; overruled.]
>
> **Q:** Are you able to tell me what percentage of those cases that were dismissed were a low gram weight?

**A:** I could estimate, yes.

**Q**: And can you please tell us?

[Objection; overruled]

**A:** I would say the overwhelming majority of the cases that were findings of no probable cause were for what will be considered a low amount of narcotics.

[Criminal complaint entered into evidence.]

**Q:** Now this complaint indicates that the estimated weight of the heroin is .2 gram. Is that a low gram weight?

**A:** That would be considered a small amount of narcotics, yes.

Before concluding, Ebersole repeated her low-weight-cases-are-regularly-thrown-out testimony. After the jury returned a verdict for defendants, Tribble argued in his motion for a new trial that the court erred in allowing Ebersole to testify as an expert without proper disclosures and without a proper foundation. The district court tersely rejected Tribble's argument: "Ebersole never offered an opinion. Ebersole testified as to *her experience* on the narcotics call in the state court, offering factual statements based on her personal observations."

The question now comes to us: Did Ebersole improperly testify as an expert and was the error, if any, of allowing her to do so sufficiently prejudicial to require a new trial? We review de novo whether Ebersole's testimony was "expert testimony subject to the

constraints of [Federal Rule of Evidence] 702." *United States v. Conn*, 297 F.3d 548, 553 (7th Cir. 2002); *Echo Inc. v. Timberland Machines & Irrigation*, 661 F.3d 959, 963 (7th Cir. 2011) (categorization of testimony as expert or lay reviewed de novo). Contrary to the district court's characterization, we conclude that Ebersole *did* testify as an expert and, accordingly, her testimony was subject to the disclosure requirements of Federal Rule of Civil Procedure 26(a)(2). Ebersole, however, was not disclosed as an expert. Under Rule 37(c)(1), non-disclosed expert testimony is automatically excluded unless "the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *Musser v. Gentiva Health Serv's*, 356 F.3d 751, 758 (7th Cir. 2004). In this case, it was neither.

Our first task, then, is categorization. The district court concluded that Ebersole offered no opinion at all (and so, by implication, she could not have offered an expert opinion). That's a surprising analysis given that Ebersole testified about the percentage of cases at Branch 50 dismissed for no probable cause over a six-month period, explained what "would be considered" a low gram weight in a narcotics case at Branch 50 and if it would include the amount of drugs allegedly found on Tribble (it would), and surmised that "the overwhelming majority of the cases that were findings of no probable cause were for what will be considered a low amount of narcotics." It is true that "the distinction between fact and opinion is, at best, one of degree," *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 168 (1988) (citing treatises), but the lead-up to the challenged testimony made it

clear that Ebersole was being asked to *summarize* her experiences in Branch 50 and *draw conclusions* about how, in general, she believed it operated. Broad generalizations and abstract conclusions are textbook examples of opinion testimony. That should have prompted the district court to consider whether her testimony was admissible under FRE 701 as lay opinion or had to pass the more rigorous standards of FRE 702. *See Beech Aircraft Corp.*, 488 U.S. at 168.

Lay opinions and inferences—as compared with opinions and inferences of experts—may not be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Lay opinion "most often takes the form of a summary of first-hand sensory observations" and may not "provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events." *Conn*, 297 F.3d at 554. In this case, Ebersole gave the jury a prosecutor's-eye view of how Branch 50 worked. As an experienced prosecutor, she has specialized knowledge that she used to make an important assertion: The "overwhelming majority" of cases that were dismissed with a finding of no probable cause shared a single feature—low gram weight. That is not testimony about Tribble's case; that is an opinion about probable cause hearings at Branch 50 in general, and—by testifying that .2 grams of heroin "would be considered a small amount of narcotics"—how Tribble's case "fits in this picture." *Id.* at 554 n. 3.

Ebersole's testimony has the familiar syllogistic structure of much expert testimony. *See* 1 MCCORMICK ON

EVID. § 13 (6th ed.). As a major premise, she presented a general theory (the Branch 50 court throws out low-weight cases), offered a case-specific minor premise (Tribble's case is low weight), and guided the jury to a conclusion (Tribble's case was thrown out as a low-weight case regardless of the merits). Now, it is true, we hasten to add, Ebersole did not spell out that conclusion herself. But silence about the obvious implication of her testimony should not have immunized it from scrutiny under FRE 702. And, for good measure, in case the point of Ebersole's testimony about Branch 50 was not completely clear, the defense returned to it at the beginning and end of closing argument. At the beginning:

> And you heard the ASA's testimony on the vast number of drug cases pending, the hundreds of cases every week, and the large number that are dismissed that have low weights. And you can take that evidence, and you can think about that, and you can consider for yourself why, given the vast number of cases, the Judges dismiss many of those cases that have low weights. The system is overwhelmed. It does not mean these officers—
>
> [Objection; overruled.]
>
> . . . It means Mr. Tribble's fortunate the cases were dismissed.

And at the end:

> [Ebersole] explained to you her experience. Three days a week dedicated to just felony drug cases. . . But in one courtroom in the City of Chi-

cago, on any given week, 20 to 40 cases on three separate dates in the system, week after week. . . . And what routinely happens? About a quarter of them are dismissed right off the bat. Vast majority of cases with low weights. . . . This was one of the low-weight cases that was before [the judge] that day and was dismissed. . . . Mr. Tribble was fortunate that the charges were dismissed, fortunate due to the state of a complicated criminal court system with hundreds and hundreds of drug cases pending every month that his case was dismissed.

Ebersole's testimony, as emphasized in closing, was that cases like Tribble's are traditionally thrown out, exactly the kind of testimony that the court's pretrial ruling prohibited. If, in a reversal of its pretrial ruling, the district court decided to allow expert testimony about how, in general, Branch 50 operated, that witness needed to comply with the admissibility standards of FRE 702 and the disclosure requirements of FRCP 26(a)(2).

Rule 26(a)(1) requires, among other things, the disclosure of the names and addresses of fact witnesses. Rule 26(a)(2) requires that expert witnesses be disclosed. That duty to disclose a witness *as an expert* is *not* excused when a witness who will testify as a fact witness *and* as an expert witness is disclosed as a fact witness. *Musser*, 356 F.3d at 757. This is a strict but well-founded requirement: "Knowing the identity of the opponent's expert witnesses allows a party to properly prepare for

trial." *Id.* Without proper disclosures, a party may miss its opportunity to disqualify the expert, retain rebuttal experts, or hold depositions for an expert not required to provide a report. *Id.* at 758. Because of these and other ways a party may be prejudiced by an improperly disclosed expert, the sanction is severe. Under Rule 37(c)(1) "exclusion of non-disclosed evidence is automatic and mandatory . . . unless non-disclosure was justified or harmless." *Musser*, 356 F.3d at 758.

In this case, non-disclosure was neither justified nor harmless. Well before trial defendants announced that they wanted to have an ASA (or the law student who acted as one) testify about the significance of a no probable cause finding at Branch 50. But, crucially, the district court specifically ruled that it would not allow such testimony—it would not allow testimony that charges like Tribble's are traditionally thrown out. Disagreement with that ruling or a belief that such testimony would be lay and not expert opinion (or no opinion at all) is not justification; at best, it's just a misunderstanding of law. *Musser*, 356 F.3d at 757.

And non-disclosure was not harmless. We have indicated several factors that a district court should consider in deciding whether non-compliance with Rule 26(a) is harmless:

> (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith

or willfulness involved in not disclosing the evidence at an earlier date.

*David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003). Reviewing for harmlessness for the first time on appeal, factors two and three can't be applied: It's too late to cure the problem or disrupt the trial. As for the fourth factor, we do not have evidence of bad faith, but there is an element of willfulness in defendants' failure to disclose Ebersole as an expert. They knew that they wanted to elicit exactly the testimony that they did—it was the subject of a pretrial ruling against them—but, nevertheless, they did not disclose Ebersole as an expert. That would have been impossible, of course, without asking the court to revisit its ruling in limine. But that could have been done. Instead defendants pressed their luck at trial and, temporarily at least, got away with it.

But willful non-disclosure is not the real problem here. The problem is that Ebersole's testimony as an undisclosed expert was extremely prejudicial. Defendants argue that there cannot be prejudice or surprise because Tribble knew Ebersole (or Sleesman) was going to testify all along. Based on the district court's pretrial ruling, however, Tribble also knew the limit of that testimony. Tribble knew that defendants would not be able to offer testimony that cases like Tribble's are traditionally thrown out. If that kind of testimony would have been allowed, and an expert would have been disclosed, then Tribble could have challenged Ebersole's competency to testify about the percentage of cases that are dismissed and whether Ebersole's analysis is sup-

ported by Branch 50's records. Tribble didn't investigate patterns of dismissal at Branch 50 preliminary hearings, but he can't be faulted for that. After the pretrial ruling against them, defendants gave no indication that they planned to introduce evidence about the *general* significance of a finding of no probable cause at a Branch 50 hearing. And even if Ebersole was qualified to testify as an expert on the subject, Tribble was deprived of the opportunity to obtain a rebuttal expert, one that might provide a more criminal defendant friendly analysis of what happens at Branch 50. *See Musser*, 356 F.3d at 758.

As defendants' closing argument made plain, Ebersole's improper testimony was critical to their theory of the case: The officers were doing their jobs as usual, made a routine arrest, and found some drugs. Tribble, the arrestee, got lucky and had his case assigned to Branch 50. Branch 50 was too busy to do its job properly and threw out Tribble's low-weight case, as it typically does with low-weight cases. Who could blame that court, really? But instead of being grateful for his good fortune, Tribble decided to see if he could cash in by suing the officers. Obviously, we think, defendants theory of the case relies on Ebersole's analysis of how things (allegedly) worked at Branch 50. Her testimony as a non-disclosed expert was not harmless. Tribble, therefore, is entitled to a new trial.

Two more issues raised by Tribble merit brief comment. First, one week before the end of discovery, after the parties were deposed, and more than a year after the original complaint was filed, Tribble moved to

amend his complaint to include a claim that he was strip-searched in violation of the Fourth Amendment. On the topic of illegal search, the prior complaint alleged only that Tribble was "searched and placed under custodial arrest. . . . [T]he search of the person of the Plaintiff . . . was without probable cause." The request to amend was denied. We review the district court's decision for abuse of discretion. *Fannon v. Guidant Corp.*, 583 F.3d 995, 1001 (7th Cir. 2009). Although we recognize that "leave to amend should be freely given . . . that does not mean it must always be given. District courts have broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile." *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 432 (7th Cir. 2009) (internal quotation omitted). In this case, Tribble sought to make an entirely new allegation one week before trial. The complaint didn't mention or imply a strip search, and even during Tribble's deposition, where he recounted the events surrounding his arrest in great detail, there was no mention of a strip search. The request to amend came too late and appeared futile; it was well within the district court's discretion to deny it. On this issue, we affirm. Tribble has a right to a new trial but not one that includes a claim involving an alleged strip search.

Finally, five days before trial, Tribble was arrested and jailed on an unrelated burglary charge. Tribble's preliminary hearing in that criminal case was scheduled for the same time as jury selection in this § 1983 case.

Tribble moved to delay jury selection for a day or a few hours so he could be present for the entire process. The district court denied the motion. The trial could not be pushed back a few hours while still leaving sufficient time for the defense to present its case. Because of the court's busy calendar, any delay would necessarily have been for weeks or months. To avoid prejudice to Tribble, however, the district court did not introduce the parties until just before opening statements, when Tribble was present. Tribble now argues that the district court's refusal to grant a continuance violated the Seventh Amendment. We doubt that Tribble himself—*in addition* to his lawyer, who didn't miss any of the proceedings—had a Seventh Amendment right to attend voir dire in these circumstances. But because we are reversing based on Ebersole's improper testimony, we do not reach this issue.

The district court is AFFIRMED in part, REVERSED in part, and the case is REMANDED for further proceedings consistent with this opinion.